FILED

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

2004 JAN -9  P 4: 02

US DISTRICT COURT
BRIDGEPORT CT

| | |
|---|---|
| MARK KLEIN, On Behalf Of Himself And All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> THE PURDUE PHARMA COMPANY, PURDUE PHARMA L.P., THE PURDUE FREDERICK COMPANY, PURDUE PHARMACEUTICALS L.P., and P.F. LABORATORIES INC., <br><br> Defendants. | CIVIL ACTION NO. <br><br> CLASS ACTION COMPLAINT <br><br> **304CV0039** <br><br> <u>JURY TRIAL DEMANDED</u> <br><br> JANUARY 9, 2004 |

## CLASS ACTION COMPLAINT

Plaintiff, Mark Klein, for his class action complaint, alleges upon information and belief based upon, <u>inter alia</u>, the investigation of his counsel, except for the allegations relating to Plaintiff and his counsel, which are alleged upon knowledge, as follows:

### NATURE OF THE ACTION

1.      This class action complaint ("Complaint") alleges violations of both federal and state antitrust laws as well as violations of the consumer protection statutes throughout the United States arising from the manufacture and marketing of OxyContin, a brand name drug. OxyContin is an opioid analgesic that is used in the treatment and management of pain in humans. The active ingredient in OxyContin is oxycodone hydrochloride controlled-release

("Oxycodone hydrochloride c-r").  To date, no competing brand name drug based on oxycodone

hydrochloride c-r and no generic version of OxyContin has been marketed in the United States.

This is because Defendants  unlawfully obtained and enforced a monopoly for OxyContin and

oxycodone hydrochloride c-r, through intentional misrepresentations to the U.S. Patent and Trade

Mark Office ("PTO").  Defendants obtained a patent for oxycodone hydrochloride c-r and caused

it to be listed in the Orange Book (defined below) in a manner that has enabled Defendants to

falsely create and extend their market monopoly for OxyContin and oxycodone hydrochloride

c-r.  Defendants further engaged in spurious litigation to unlawfully enforce their patent, although

they knew or should have known that the patent was unenforceable. As a result of Defendants'

conduct, Plaintiff and the Class (as defined herein) have been damaged in that purchasers of

OxyContin paid and continue to pay millions of dollars for OxyContin at supra-competitive

prices. If competing and/or generic versions of OxyContin were available, consumers would be

able to purchase it at a far lower cost than what they were or are currently paying.

     2.     Count I of this Complaint is brought by the Plaintiff on behalf of himself and all

other purchasers of OxyContin seeking equitable, injunctive and declaratory relief against

Defendants based on allegations of monopolization of, and an attempt to monopolize, the market

for OxyContin and generic bioequivalents of OxyContin, in violation of Section 2 of the

Sherman Act, 15 U.S.C. §2.

     3.     Counts II and III are brought by Plaintiff on behalf of himself and those Class

members who purchased or paid for OxyContin in Arizona, California, the District of Columbia,

Florida, Hawaii, Iowa, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Michigan,

Minnesota, Nevada, New Jersey, New Mexico, New York, North Carolina, North Dakota, South

Dakota, Tennessee, Vermont, West Virginia and Wisconsin (the "Indirect Purchaser States").

Counts I and II are brought pursuant to the antitrust and unfair and deceptive trade practices acts

of the Indirect Purchaser States.

## JURISDICTION AND VENUE

4.      This action is brought under Section 16 of the Clayton Act, 15 U.S.C. § 26, for

injunctive and equitable relief to remedy Defendants' violations of the federal antitrust laws,

particularly Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2.  The Court has jurisdiction

over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a) and 15 U.S.C. § 26.  This court has

supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

5.      Venue is proper in this judicial district pursuant to 15 U.S.C. § 22 and 28 U.S.C.

§ 1391(b) because Defendants transact business, are found, and/or have agents in this district and

because a substantial portion of the affected trade and commerce described below has been

carried out in this district.

6.      The illegal monopolization and attempt to monopolize the market for OxyContin

and generic versions of OxyContin, as alleged herein, have substantially affected interstate and

foreign commerce.

## THE PARTIES

### Plaintiff

7.      Plaintiff, Mark Klein ("Klein"), resides at 1115 East 28th Street, Brooklyn, New

York 11210. During the Class Period, Klein purchased OxyContin for purposes other than resale.

3

Klein brings this case on behalf of himself and all others similarly situated throughout the United States. During the Class Period, Klein has paid, at supra-competitive prices, for some or all of the cost of OxyContin, other than for resale, and has thereby been injured as a result of Defendants' conduct.

**Defendants**

8.     Defendant, Purdue Pharma L.P. ("Purdue"), is a corporation organized and existing under the laws of the state of Delaware. Its principal place of business is located at One Stamford Forum, 201 Tresser Boulevard, Stamford Connecticut. It is engaged in the business of research, development, manufacture and sale of pharmaceutical products throughout the United States. Purdue Pharma L.P. owns the patent for OxyContin tablets.

9.     Defendant, The Purdue Frederick Company ("Frederick Co."), is a corporation organized and existing under the laws of the state of New York. Its principal place of business is located at One Stamford Forum, 201 Tresser Boulevard, Stamford Connecticut. It is engaged in the business of research, development, manufacture and sale of pharmaceutical products throughout the United States.

10.     Defendant, the Purdue Pharma Company ("Purdue Co."), is a general partnership organized and existing under the laws of the state of Delaware. Its principal place of business is located at One Stamford Forum, 201 Tresser Boulevard, Stamford Connecticut. Purdue Pharma and Purdue Frederick are general partners of the The Purdue Pharma Company. It is engaged in the business of research, development, manufacture and sale of pharmaceutical products throughout the United States.

4

11.     Defendant, Purdue Pharmaceuticals L.P. ("Purdue Pharmaceuticals"), is a corporation organized and existing under the laws of the state of Delaware.  Its principal place of business is located at 4701 Purdue Drive, Wilson, North Carolina.  It is engaged in the manufacturing and formulation of medications for pain relief sold throughout the United States.

12.     Defendant, P.F. Laboratories Inc. ("P.F. Labs"), is a corporation organized and existing under the laws of the state of New Jersey.  Its principal place of business is located at 700 Union Boulevard, Totowa, New Jersey.  It is engaged in the production of pharmaceutical products sold throughout the United States.

13.     Together Purdue Pharma, Frederick Co., Purdue Co., Purdue Pharmaceuticals, and P.F. Labs (the "Defendants") manufacture and market OxyContin throughout the United States.

## INTERSTATE TRADE AND COMMERCE

14.     During all or part of the relevant time period:

(a)     Defendants manufactured and sold substantial amounts of OxyContin in a continuous and uninterrupted flow of commerce across state and national lines and throughout the United States;

(b)     Defendants transmitted funds, as well as contracts, bills, and other forms of business communications and transactions, in a continuous and uninterrupted flow of commerce across state and national lines in connection with the sales of OxyContin; and

(c)     Defendants employed, in furtherance of their monopolization and attempt to monopolize, as alleged herein, the United States mails and interstate and international telephone lines, as well as means of interstate and international travel.

## RELEVANT MARKETS

15.     The relevant product market is the market for the manufacture and sale of OxyContin, oxycodone hydrochloride c-r, and all generic bioequivalents rated "AB" by the United States Food and Drug Administration ("FDA").  The relevant geographic markets are the United States and its territories as a whole and the Indirect Purchaser States.  At all relevant times up to and including the present, Defendants' market share in the relevant product and geographic markets was 100%.

16.     Defendant Purdue developed and patented OxyContin as the "first and only 12-hour oxycodone analgesic." OxyContin contains oxycodone hydrochloride c-r, a very strong narcotic pain reliever. OxyContin and generic oxycodone hydrochloride c-r  products are not reasonably interchangeable with other analgesics. OxyContin contains more oxycodone than any drug previously marketed.  It is available in 10mg, 20mg, 40mg, 80mg and 160mg.  Percocet, the most familiar oxycodone drug, contains only 5mg of oxycodone.  OxyContin provides an effective way for patients suffering from chronic pain to get a full night's rest due to it's time release properties. OxyContin also provides relief for a full twelve hours while other analgesics are often effective for only four to six hours. Thus, the benefits of OxyContin are unique and unmatched by other "similar" drugs.

6

## FACTUAL ALLEGATIONS

**A.    Brand-Name Drugs and Generic Drugs**

17.    The manufacture, marketing, distribution and sale of prescription drugs is one of the most profitable industries in the United States.  The U.S. market accounts for almost half of the world's prescription pharmaceutical revenues.  The cost of prescription drugs in the United States rises every year.

18.    The availability of generic drugs has been an effective means of lowering the cost of prescription drugs. Generic drugs, which also must be approved by the FDA, have the same active chemical composition and provide the same therapeutic effects as the pioneer brand-name drugs upon which they are modeled.  The FDA assigns an "AB" rating to generic drugs that are bio-equivalent to pioneer or brand-name drugs.

19.    Generic drugs are normally priced substantially below the brand-name drugs to which they are bio-equivalent. As a general matter, generic drugs save consumers and third-party payers millions of dollars a year.

**B.    The Federal Mechanism For Approval Of Pioneer Drugs**

20.    Under the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §301 et seq. (the "Act"), approval by the FDA is required before a company may begin selling a new drug. Pre-market approval for a new drug, often referred to as a "pioneer" or "brand-name" drug, must be sought by filing a New Drug Application ("NDA") with the FDA, demonstrating that the drug is safe and effective for its intended use.  New drugs that are approved for sale in the United States by the FDA are typically (but not necessarily) covered by patents, which provide the patent

owner with the exclusive right to sell that new or pioneer drug in the United States for the duration of the patents involved, plus any extension of the original patent period (the "FDA Exclusivity Period") granted pursuant to the Drug Price Competition and Patent Term Restoration Act of 1984, 98 Stat. 1585, 21 U.S.C. § 355 ("Hatch-Waxman Act").

21.     Once the NDA is approved, the FDA lists any patents referenced as part of the NDA application process in a publication known as the Approved Drug Products with Therapeutic Equivalence Evaluations.  This publications is commonly called the "Orange Book."

22.     Once the safety and effectiveness of a new drug is approved by the FDA, it may be used in the United States only under the direction and care of a physician who writes a prescription, specifying the drug by name, which must be dispensed by a licensed pharmacist. The pharmacist must, in turn, fill the prescription with the drug brand specified by the physician, unless an AB-related generic version of that pioneer drug which has been approved by the FDA is available.

**C.     Generic Drugs**

23.     Generic drugs are drugs that the FDA has found to have the same active chemical composition and provide the same therapeutic effects as the pioneer drugs.  Where a generic drug is completely equivalent to a pioneer or brand-name drug, the FDA assigns the generic drug an "AB" rating.

24.     If a generic version of a brand-name drug exists and the physician has not specifically indicated on the prescription "DAW" or "dispense as written", then: (a) for consumers covered by most insurance plans, the pharmacist will substitute the generic drug; and

8

(b) for consumers whose purchases are not covered by insurance plans, the pharmacist will offer the consumer the choice of purchasing the branded drug, or the AB-rated generic at a lower price.

25.     Once a physician writes a prescription for a brand-name drug such a OxyContin, that prescription defines and limits the market to the drug names or its AB-rated generic equivalent.  Only drugs that carry the FDA's AB generic rating may be substituted by a pharmacist for a physician's prescription for a brand-name drug.

### D.     Abbreviated New Drug Applications For Generic Drugs

26.     Congress enacted the Hatch-Waxman Act in 1984 to establish an abbreviated process to expedite and facilitate the development and approval of generic drugs.  Consumers benefit from the choice and competition.  To effectuate its purpose, the Hatch-Waxman Act permits a generic drug manufacturer to file an Abbreviated New Drug Application (an "ANDA"), which incorporates by reference the safety and effectiveness data developed and previously submitted by the manufacturer of the original, pioneer drug.  The Hatch-Waxman Act also provides an economic incentive to the first generic drug manufacturer to file an ANDA for a particular generic drug within a 180-day statutory period of market exclusivity, during which time the manufacturer has the right to market its drug free from competition from other generic manufactures.

27.     The ANDA must include information concerning the applicant's position vis-a-vis the patent that the pioneer drug manufacturer claims applies to the drug.  Therefore, the ANDA filer must make one of four certifications:

9

I.     that no patent for the pioneer drug has been filed with the FDA (a "Paragraph I Certification"):

II.    that the patent for the pioneer drug has expired (a "Paragraph II Certification");

III.   that the patent for the pioneer drug will expire on a particular date and the generic company does not seek to market its generic product before that date (a "Paragraph III Certification"); or

IV.    that the patent for the pioneer drug is invalid or will not be infringed upon by the proposed generic company's product (a "Paragraph IV Certification").

21 U.S.C. § 355(j)(2)(A)(vii). In the case of a patent that has not yet expired, the ANDA applicant's only certification options are Paragraph III or IV Certifications.

28.    If the ANDA contains a Paragraph IV Certification, the ANDA applicant must provide notice to the owner of each patent that is referred to in the certification, and to the holder of the approved NDA to which the ANDA refers. See 21 U.S.C. §355(j)(2)(B)(i). The notice must include a detailed statement of the factual and legal basis for the ANDA applicant's assertion that the patent is not valid or will not be infringed by the generic product. *See id.*; 21 C.F.R. § 314.95.

29.    The brand-name drug patent owner, upon receiving a Paragraph IV Certification from an ANDA applicant, has 45 days to initiate a patent infringement suit against the applicant. *See* 21 U.S.C §355(j)(5)(B)(iii). If no action is initiated within 45 days, the process for FDA

approval of the generic product is not delayed by patent issues.  However, if a patent

infringement suit is brought within the 45-day window, FDA approval of the ANDA is

automatically postponed until the earliest of the expiration of the patents, the expiration of 30

months from the patent holder's receipt of notice of the Paragraph IV Certification, or a final

judicial determination of non-infringement.

30.     Accordingly, brand-name drug patent holders need only to file a patent

infringement lawsuit within 45 days of receipt of Paragraph IV Certification in order to

automatically block an ANDA applicant's generic drug from entering the market for up to 30

months.

**E.     Defendants Made International Misrepresentations to the PTO and Engaged
in Sham and Maintain an Improper Monopoly for
OxyContin and Oxycodone Hydrochloride**

31.     Defendants are the owner of Patent No. 5,549912 (the "'912 Patent"), Patent No.

5,508,042 (the "'042 Patent) and Patent No. 5,656,295 (the "'295 Patent"), which are

respectively, a continuation-in-part, divisional application and continuation-in-part of Patent No.

Hydrochloride (the '912 patent, the '042 patent and the '295 patent are collectively referred to

herein as the "Patent").  Pursuant to NDA No. 20-553, Defendants have marketed OxyContin,

whose active ingredient is oxycodone hydrochloride c-r, in the United States and elsewhere since

the drug received FDA approval in 1995.

32.     Endo Pharmaceuticals Holding ("Endo"), is a manufacturer of generic

pharmaceutical products.  In July 2000, Endo filed an ANDA with the FDA to market generic

version of OxyContin in the 40 mg strength.  In February, 2001 Endo amended its ANDA

11

application to include the 10mg and 20mg strengths of oxycodone hydrochloride c-r and in July 2001 Endo's ANDA was amended to include the 80 mg strength.

33.     After the initial ANDA application and each subsequent amendment thereto, Endo gave written notice ("notice of certification") to Defendants, pursuant to 21 U.S.C. § 355(j)(2)(B)(i) and (ii), that its ANDAs and the accompanying certification had been filed with the FDA.  In accordance with 21 U.S.C. § 355(j)(2)(B)(ii), the notices also set forth the legal factual bases for their claims that the *'912, '042* and *'295* patents are invalid and/or unenforceable.

34.     Within forty-five days of receipt of the notice of certification, Defendants brought suit for infringement of the *'912, '042* and *'295* patents (hereinafter referred to collectively as the "Infringement Action") in the U.S. District Court for the Southern District of New York.  The filing of the Infringement Action resulted in an automatic 30-month stay of the FDA's authority to grant final marketing approval to Endo under its ANDA for oxyCodone hydrochloride.  The FDA cannot grant final marketing approval to Endo's ANDA until they prevail in the Infringement Action or until at least 30 months expire, whichever is sooner.

35.     By way of defenses and counterclaims to the Infringement Action, Endo claimed that the *'912, '042* and *'295* patents are invalid, unenforceable and/or not infringed by its formulation of oxycodone hydrochloride c-r tablets, 10 mg, 20 mg, 40 mg and 80 mg.  Endo also counterclaimed for antitrust damages because Defendants breached its duty of candor to, and engaged in inequitable conduct before, the PTO and claimed that Defendants are asserting their right in the Patents while aware that the Patents are unenforceable.

36.     To win its patents, Purdue represented to the PTO that Oxycontin was unique because 90 percent of chronic pain patients would get relief from low dosages ranging from 10 to 40 milligrams.

37.     Both before and after the Patents were issued, Defendants knew that the Patents were not enforceable because Defendants and their representatives had knowingly made material misrepresentations to the PTO in connection with the prosecution of the Patents.

38.     Despite this knowledge, Defendants commenced, prosecuted, and maintained the sham infringement actions against Endo and defended against their counterclaim suits for the improper purpose of maintaining a monopoly in the Relevant Markets, and to conceal by deceit that unlawful interference and monopoly maintenance.

39.     Defendants continued to maintain the sham Orange Book listing, the infringement actions, and their sham defenses of the counterclaim suits knowingly, intentionally, affirmatively, with the purpose of unlawfully maintaining their monopoly in the Relevant Markets, and with the effect of affirmatively and continuously foreclosing the Generic Manufacturers and any other competitors from the Relevant Markets.

40.     On July 31, 2002, the FDA granted "tentative" approval to Endo's ANDA No.75-923 for Oxycodone hydrochloride c-r Tablets, 10 mg, 20 mg, 40 mg and 80 mg.  By granting "tentative" approval, the FDA determined that all the criteria for ANDA "final" approval had been satisfied except for the resolution of issues relating to patents.

**F.       The Court's Ruling Invalidating the '912, '042 and '295 Patents**

41.       A non-jury trial commenced on June 2, 2003, between Defendants and Endo. Post trial briefing was completed on August 8, 2003.  On January 5, 2004, Judge Sidney H. Stein held that the '912, '042 and '295 patents were unenforceable because Defendants made material misrepresentation to the PTO.

42.       During the trial, Dr. Robert F. Kaiko, OxyContin's inventor, acknowledged that he had done no clinical studies and had no evidence to support Purdue's claim that the drug was effective in low dosages for 90 percent of patients.  Purdue admitted that Dr. Kaiko's "discovery" was not supported by evidence or clinical studies but insisted it was true even through it was unable to prove it.  Internal company documents show that in 1993 Purdue executives concluded that the company's representations to the P.T.O "weren't anywhere close" to bring proved and were "clearly Bob Kaiko's vision."

43.       The Court found that:

> . . . more than a year after representing to the PTO that a four-fold range of dosages was a "surprising discovery," internal memoranda reveal that Dr. Kaiko considered his surprising discovery only a non-qualified "expectation" that needed additional studies and supporting data.  Shortly thereafter, Dr. Goldenheim noted in response to a memo from Dr. Kaiko where Dr. Kaiko asserted that OxyContin was the "most efficiently titratable long-acting strong analgesic, that "this is a theory - not yet proven.  We will have to see."
>
> The record as a whole reflects a clear pattern of intentional misrepresentation of a material fact - Purdue knew that it did not have "scientific proof" of its "discovery," yet repeatedly asserted its "discovery" to the PTO in precise, quantified, past-tense language.

14

beneficiaries (the "Class"). A person and/or entity "purchased" OxyContin if they paid some or all of the purchase price.

Excluded from the Class are all Defendants, their officers, subsidiaries and affiliates; all government entities; and all persons or entities that purchased OxyContin for purpose of resale, or directly from any of the Defendants or their affiliates.

47.     Plaintiff seeks class certification pursuant to Rule 23(b)(2) of the Federal Rule of Civil Procedure as to declaratory and equitable relief sought herein, and Rule 23(b)(3) as to the damages sought herein.

48.     <u>Numerosity of the Class</u>: Members of the Class are so numerous that their individual joinder herein is impracticable.  Upon information and belief, the number of Class members is more than a million. The Class members are identifiable from information and records that are in the possession of pharmacies, drugstores and managed care organizations.

49.     <u>Existence and Predominance of Common Questions of Fact and Law</u>: Common questions of law and fact exist as to all members of the Class.  These questions predominate over the questions affecting only individual Class members.  Among the common legal and factual questions are:

(a)     Whether the *'912, '042* and *'295* patents were unenforceable based on Defendant's material misrepresentation to the PTO;

(b)     whether Defendants engaged in sham litigation for the purpose of preventing competition;

16

(c)     whether Defendants have monopolized and attempt to monopolize the market for OxyContin and generic bio-equivalents to OxyContin;

(d)     whether Defendants knowingly, intentionally and unlawfully excluded competitors and potential competitors from the market for OxyContin and generic bio-equivalents to OxyContin;

(e)     whether Plaintiffs and members of the Class are entitled to declaratory, equitable and/or injunctive relief; and

(f)     whether Plaintiffs and the Class have been damaged and the amount of damages.

50.     <u>Typicality</u>:  Plaintiff's claims are typical of the claims of the other members of the Class because Plaintiff and all of the individual members of the Class purchased and/or paid for OxyContin throughout the United States, including the Indirect Purchaser States, during the Class Period. Such purchases and payments were made for consumer consumption of OxyContin.  Plaintiffs and all members of the Class were damaged by the same wrongful conduct of Defendants.

51.     <u>Adequacy</u>:  Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the members of the Class he seeks to represent. Plaintiff has retained counsel competent and experienced in antitrust and complex class action litigation, and Plaintiff intends to prosecute this action vigorously.  The interests of the members of the Class will be fairly and adequately protected by Plaintiff and his counsel.

17

52.    <u>Superiority</u>:  The class action is superior to other available means for the fair and efficient adjudication of the claims of Plaintiff.  Because of the size of the individual Class members' claims, few, if any, Class members could afford to seek legal redress individually for the wrongs complained of herein. Absent a class action, the Class members will continue to suffer damages, and Defendants' violations of law will proceed without remedy while Defendants continue to retain the proceeds of their ill-gotten gains.  Moreover, if the members of the Class themselves could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and the expense to all parties and the court system presented by the complex legal and factual issues of the case.  By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

53.    Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

## COUNT I

**FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER
SECTION 16 OF THE CLAYTON ACT FOR DEFENDANTS'
VIOLATIONS OF SECTION 2 OF THE SHERMAN ACT**

54.    Plaintiff hereby incorporates by reference the allegations contained above.

55.    As described above, Defendants knowingly and willfully engaged in a course of conduct designed to improperly obtain and extend their monopoly power in the Relevant

18

Markets.  This course of conduct included, *inter alia*, the following acts: (i) the intentional

submission of false patent information to the FDA; (ii) the intentional submission of fraudulent

statements to, and omissions of material facts from, the PTO; (iii) the prosecution of baseless,

sham patent litigation against generic competitors; and (iv) maintaining sham defenses of the

counterclaims by Endo.  The result of Defendants' unlawful conduct has been to obtain and

extend their monopoly in the relevant markets for OxyContin and its bioequivalents.

     56.     Defendants' Infringement Action constitute sham litigation, in that the suit was

objectively baseless in that Defendants' motivation in bringing the actions was to directly

interfere with the ability of Endo and other generic competitors to market less expensive generic

versions of OxyContin that would compete with the brand-name product.

     57.     Defendants intentionally and wrongfully created and maintained a monopoly

power in the Relevant Markets in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

     58.     Plaintiff and the other members of the Class have been injured by reason of

Defendants' antitrust violations as alleged in this Count. Their injury consists of being deprived

of the ability to purchase less expensive, generic versions of OxyContin, and being forced to pay

higher prices for oxycodone hydrochloride c-r products than they would have paid in the absence

of the antitrust violation. The injury to Plaintiff and the Class is the type of injury antitrust laws

were designed to prevent, and the injury flows directly and indirectly from Defendants' unlawful

conduct.

     59.     Plaintiffs and the Class, pursuant to Rule 57 of the Federal Rules of Civil

Procedure and 18 U.S.C. § 2201(a), hereby seek a declaratory judgment that Defendants' conduct

19

in seeking to prevent competition through the use of the invalid, '912, '042 and '295 patents violates Section 2 of the Sherman Act.

60.    Plaintiff and the Class further seek equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anti-competitive market effects caused by the unlawful conduct of Defendants, and other relief so as to assure that similar anti-competitive conduct does not occur in the future.

### COUNT II

### FOR COMPENSATORY AND MULTIPLE DAMAGES UNDER THE ANTITRUST AND/OR CONSUMER PROTECTION STATUTES OF THE INDIRECT PURCHASER STATES THROUGHOUT THE UNITED STATES

61.    Plaintiff hereby incorporates by reference all of the allegations contained above.

62.    Defendants' conduct described herein constitutes unlawful acts of monopolization and attempts to monopolize, as well as prohibited practices and unconscionable acts and conduct under the antitrust and/or unfair and deceptive trade practices acts of the Indirect Purchaser States throughout the United States.

63.    As a result of the conduct described above, Plaintiff and the Class have sustained and will continue to sustain substantial losses and damage because Plaintiff and the Class are being deprived of the ability to purchase less expensive, generic versions of OxyContin, and paying prices for oxycodone hydrochloride c-r products that were higher than they would have been but for Defendants' improper actions. The full amount of such damages are presently unknown and will be determined after discovery.

20

64.     Plaintiffs and the Class seek compensatory damages, multiple damages, treble damages, and any other damages as permitted by state law, for their injuries caused by these violations pursuant to the antitrust and consumer protection statutes throughout the United States.

## COUNT III

### FOR INJUNCTIVE AND DECLARATORY RELIEF UNDER THE ANTITRUST AND/OR CONSUMER PROTECTION STATUTES OF THE INDIRECT PURCHASER STATES THROUGHOUT THE UNITED STATES

65.     Plaintiff hereby incorporates by reference the allegations contained above.

66.     Defendants' conduct described above constitutes unlawful acts of monopolization and attempts to monopolize, as well as prohibited practices and unconscionable conduct under the antitrust and/or unfair and deceptive trade practices acts of the Indirect Purchaser States throughout the United States.

67.     Plaintiff and the other members of the Class have been injured by reason of Defendants' antitrust violations alleged in this Count.  Their injury consists of being deprived of the ability to purchase less expensive, generic versions of OxyContin, and paying higher prices for OxyContin and generic versions of OxyContin than they would have paid but for Defendants' improper actions.  The injury to Plaintiffs and the Class is the type of injury antitrust laws were designed to prevent, and the injury flows from Defendants' unlawful conduct.

68.     Plaintiffs and the Class, pursuant to laws of the Indirect Purchaser States, hereby seek a declaratory judgment that Defendants' conduct in seeking to prevent competition through the use of the invalid '912, '042 and '295 patents is unlawful.  Plaintiff and the Class further seek

equitable and injunctive relief pursuant to the laws of the Indirect Purchasers States throughout the United States to correct for the anti-competitive market effects and other harms to purchasers caused by the unlawful conduct of Defendants, and other relief so as to assure that similar conduct does not occur in the future.

## PRAYER FOR RELIEF

**WHEREFORE**,  Plaintiff, on his own behalf and on behalf of the Class, hereby prays for the following relief:

A.    An order certifying this action as a Nationwide Class Action and appointing Plaintiff and his counsel to represent the Class;

B.    An order permanently enjoining Defendant from continuing any further illegal activities as alleged herein;

C.    An order that the conduct alleged herein be declared, adjudged and decreed to be in violation of Section 2 of the Sherman Act, and in violation of the statutes of the Indirect Purchaser States throughout the United States as set forth above;

D.    An order awarding Plaintiff and each member of the class damages and, where applicable, treble, multiple, and other damages, pursuant to the laws of the Indirect Purchaser States throughout the United States, including interest;

E.    An order allowing Plaintiff and the Class to recover their costs of suit, including reasonable attorneys' fees, expert fees and expenses as provided by law; and

F.    An order granting such other and further relief as the Court deems just and proper.

## **JURY DEMANDED**

Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil

Procedure, of all issues so triable.

THE PLAINTIFF,

By: _____

J. DANIEL SAGARIN, CT04289
DAVID SLOSSBERG, CT13116
HURWITZ & SAGARIN
147 North Broad Street
P.O. Box 112
Milford, CT 06460-0112
203/877-8000

OF COUNSEL:

ROBERT J. BERG
RONALD J. ARANOFF
BERNSTEIN LIEBHARD & LIFSHITZ, LLP
10 East 40th Street-22nd Floor
New York, NY 10016
212/ 779-1414

23